FILED
2012 Aug-08 PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS S. CHAMBERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action Number |
| | ) | **5:11-cv-1373-AKK** |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Nicholas S. Chambers ("Chambers") brings this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA"). Doc. 1. This court finds that the Administrative Law Judge's ("ALJ") decision - which has become the decision of the Commissioner - is not supported by substantial evidence. Therefore, for the reasons elaborated herein, the court will **REVERSE** and **REMAND** the decision denying benefits to the ALJ for him to reach a disability determination based on the complete medical record.

# I.  Procedural History

Chambers filed his application for Title II disability insurance benefits

("DIB") and Title XVI Supplemental Security Income ("SSI") on May 12, 2006,

alleging a disability onset date of March 12, 2005, due to affective/mood disorders

and back disorders (discogenic and degenerative).  (R. 229-237).  After the SSA

denied his applications on September 19, 2006, (R. 158-161), Chambers requested

a hearing on October 4, 2006, (R. 190), which he received on January 30, 2008,

(R. 125-157).  On February 19, 2008, the ALJ found that Chambers had not been

under a disability "from March 12, 2005, through the date of this decision," (R.

43-54); however, on March 10, 2008, Chambers requested review of the ALJ's

decision, (R. 201), and the Appeals Council remanded the matter on August 8,

2008, requiring the ALJ to provide "a complete evaluation of the February 22,

2007 treating source opinion of Shelinder Aggarwal, M.D," (R. 163-165).

Given the Appeals Council's directive, Chambers requested a supplemental

hearing from the ALJ on May 28, 2009, (R. 215), which he received on June 15,

2009, (R. 99-124).  Moreover, Chambers received a second supplemental hearing

on November 4, 2009, where the ALJ heard medical testimony and testimony from

a vocational expert ("VE").  (R. 62-98).  At the time of this hearing, Chambers was

30 years old with a tenth grade education.  (R. 66).  The ALJ again denied

Chambers' claims on December 11, 2009, (R. 14-30), which became the final decision of the Commissioner when the Appeals Council refused to grant review on February 22, 2011, (R. 1-4).  Chambers then filed this action on April 4, 2011, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Doc. 1.  On November 14, 2011, the Clerk of Court reassigned this matter to the undersigned.  Doc. 11.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence."  *See id*.  (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a

preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the court must affirm the Commissioner's factual findings even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). Specifically, the Commissioner

must determine in sequence:

(1)   whether the claimant is currently unemployed;

(2)   whether the claimant has a severe impairment;

(3)   whether the impairment meets or equals one listed by the Secretary;

(4)   whether the claimant is unable to perform his or her past work; and

(5)   whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *Id.* at 1030 (citing 20 C.F.R. § 416.920(a)-(f)). "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

## IV.  The ALJ's Decision

The court turns now to the ALJ's decision to ascertain whether Chambers is correct that the ALJ committed reversible error. In that regard, the court notes that, performing the five step analysis, the ALJ initially determined that Chambers had not engaged in substantial gainful activity since his alleged onset date, March

12, 2005, and therefore met Step One.  (R. 17).  Next, the ALJ found that

Chambers suffered from the following severe impairments: chronic low back pain

secondary to degenerative disk disease, spondylosis, herniated disk at L4-5, s/p

microdiskectomy at L4-5 on left (March 2005), and post failed back surgery

syndrome.  *Id.*  The ALJ then proceeded to the next step and found that Chambers

failed to satisfy Step Three because he "does not have an impairment or

combination of impairments that meets or medically equals one of the listed

impairments."  *Id.*  Although the ALJ answered Step Three in the negative,

consistent with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to

Step Four, where he determined that:

> [T]he claimant has the residual functional capacity to lift 15 pounds
> occasionally and 10 pounds frequently; sit for six hours total out of an
> eight-hour workday and for less than 45 minutes without the ability to
> stand and stretch and sit back down; with usual customary breaks he
> can stand four hours total out of an eight-hour workday and for less
> than 30 minutes without the ability to sit down for 1-2 minutes or to
> change that position; walk four hours total out of an eight-hour
> workday and for no longer 30 minutes at time without the ability to
> sit down for 1-2 minutes or to change that position; occasionally
> manipulate stairs, kneel, and crouch (bending and keeping back
> straight); he should avoid stairs, crawling, stooping (bending and
> curving back), heavy vibratory machinery, unprotected heights, and
> extreme cold exposure.  He has unlimited use of the upper extremities
> for fine and gross manipulation.

(R. 18).  Moreover, in light of Chambers' residual functional capacity ("RFC"),

the ALJ held that Chambers is "unable to perform any past relevant work." (R. 28). Lastly, in Step Five, the ALJ considered Chambers' age, education, work experience, and RFC, and determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* Because the ALJ answered Step Five in the negative, the ALJ found that Chambers "has not been under a disability, as defined in the Social Security Act, from March 12, 2005 through the date of this decision." (R. 29). *See also McDaniel*, 800 F.2d at 1030.

## V. Analysis

The court turns now to Chambers' sole contention that the ALJ erred "in rejecting every examining physician opinion of record as well as the State Agency reviewing physician opinion in favor of the telephonic testimony of an orthopedist (R. 25) whose limited contact with Plaintiff can be described as woeful by the ALJ's own standard." Doc. 9, at 8. More specifically, Chambers contends that, based on unsupported conclusions by the non-examining medical expert Dr. Alan Levine, the ALJ improperly disregarded the objective medical evidence including the opinions of treating and examining physicians Dr. S. Aggarwal, Dr. John Lary, and Dr. Gilbert Aust. *Id.* at 7-9.

### A.   Medical Evidence

As Chambers focuses specifically on the medical opinions of specific

physicians, the court will address the record evidence for each pertinent physician as well as other relevant medical evidence.

      1.    <u>Dr. Aggarwal</u>

Chambers first presented to Dr. Aggarwal on October 19, 2006 for evaluation and treatment regarding back pain after receiving back surgery in March 2005.  (R. 448).  Dr. Aggarwal provided in the treatment notes that "[o]n examination of the lower back there is a well-healed lower lumbar midline scar. ROM is limited by 25% in all planes.  There is moderate tenderness in the related paraspinal muscles.  SLR test is questionably positive on the left side."  (R. 449). Additionally, Dr. Aggarwal found "Motor: 5/5 strength bilaterally[;] Sensation: intact[;] Reflexes: 2+ bilaterally[;] Station & Gait: Pt is able to walk on heels and toes and squat without difficulty."  *Id.*  Accordingly, Dr. Aggarwal diagnosed Chambers with "chronic low back pain due to arthritis and disc disease" and "lumbosacral radiculitis."  (R. 450).  Chambers visited Dr. Aggarwal again on November 16, 2006 with "significant pain and not[ing] the medicines are not lasting."  (R. 447).  Dr. Aggarwal found that Chambers suffered from chronic low back pain, increased certain pain medications, and stated that Chambers "appears to be developing a chronic pain condition that is unlikely to improve.  He will likely be narcotic dependent.  It is also my opinion that [Chambers'] medical

condition at this time precludes him from gainful employment." *Id.*

Chambers again presented to Dr. Aggarwal on December 12, 2006, and "noted some benefit with the Methadone but is still having significant pain." (R. 446). While Chambers maintained the same "neuromuscular exam" and "chronic low back pain," Dr. Aggarwal again increased Chambers' pain medications. *Id.* Two weeks later, on December 28, 2006, Dr. Aggarwal's notes provide that Chambers "called me last night as he had fallen because of weakness and pain in his legs. He ended up going to Athens-Limestone emergency room but because of the long wait he decided to follow up with me today. [Chambers] is having increased falls . . . . He has been having more pain in his back and legs. He notes the medicines are not holding him." (R. 445). For this visit, Chambers' "neuromuscular exam [was] unchanged" and Dr. Aggarwal again diagnosed Chambers with "chronic low pack pain with recent aggravation due to fall." *Id.* On January 25, 2007, Chambers stated to Dr. Aggarwal that "Methadone and Dilaudid are not working [and he voiced] concerned that his condition is not improving." (R. 454). As such, Dr. Aggarwal continued Chambers' Soma prescription but discontinued Methadone and Dilaudid, prescribing instead Duragesic and Percocet. *Id.*

Chambers visited Dr. Aggarwal again on February 22, 2007 complaining of

"breakthrough pain and not[ing] the Duragesic is not lasting." (R. 453). Dr.

Aggarwal increased Chambers' Duragesic prescription and also wrote a letter

describing Chambers' status and functional limitations. (R. 452-453).

Specifically, Dr. Aggarwal provided that Chambers "should not lift greater than

10lbs; standing and walking 10 minutes at a time with a maximum of 1-2 hours

per day and sitting 30 minutes at a time with a maximum of 4 hours per day. It is

my opinion that Mr. Chambers is unable to work. I expect his condition to last for

at least 12 months, if not longer. It is my opinion he has chronic severe pain for

which he is receiving chronic narcotic management." (R. 452). Finally, on May

17, 2007, Chambers presented sleeping difficulties to Dr. Aggarwal. (R. 468). Dr.

Aggarwal stated in the treatment notes that "I told [Chambers] he is already on a

significant amount of medications and I feel uncomfortable giving him more

medications . . . . [Chambers] should continue medications as previously

[prescribed] and follow up with me for re-evaluation in three months or sooner if

problems arise." *Id.*

      2.   Dr. Lary

Dr. John Lary originally examined Chambers on August 7, 2006 upon

request by the Disability Determination Service ("DDS"). (R. 389-399). As it

relates to the back examination, Dr. Lary stated: "No kyphosis is present. Back

musculature appears normal to inspection and palpation.  Is able to flex upper

body at waist 45 degrees but is unable to hyperextend to any degree.  Straight leg

raising test is abnormal at 30 degrees bilaterally." (R. 392).  Dr. Lary also

provided that Chambers is "[a]ble to walk normally.  Is able to heel walk and toe

walk.  Is able to assume and arise from a squat position, but experiences pain on

doing so." *Id.* As such, Dr. Lary diagnosed Chambers with post lumbar

laminectomy, lumbosacral facet syndrome, lumbar radiculopathy, left sacroiliac

joint dysfunction, depression, and controlled hypertension.  (R. 393).  And, Dr.

Lary concluded "[i]n my opinion, his ability to sit, stand, walk, lift, carry, bend,

squat, and reach is impaired by his chronic back pain.  His ability to see, hear,

speak, understand, and manipulate small objects is unimpaired." *Id.*

Dr. Lary again examined Chambers on June 5, 2009 at the request of the

DDS, (R. 544-553), and provided in the "History of Present Illness" that:

> [Chambers'] chronic back pain has persisted and not gotten any
> better.  He has recently undergone another lumbar spine MRI scan,
> dated January 7, 2009, [that] reportedly shows finding of a radial tear
> in the left posterior-lateral aspect of his L4-5 disc – in the same left
> lateral L4-5 region that experienced a disc herniation on his March
> 22, 2005 lumbar spine MRI.  In addition, this recent MRI also shows
> a new finding of generalized disc bulging that is beginning to affect
> the right L4-5 neuroforaminal region.  As yet, the claimant has not
> experienced any radicular pain in his right hip or leg.

(R. 544).  As it relates to Chambers' general appearance, Dr. Lary noted that he sat

"in a partially leaning back position with his body weight partially supported by his arms, a position typically often assumed by patients with back pain from spinal disorder." (R. 545). Furthermore, Chambers "was fidgety and frequently shifted his body weight from one buttocks to the other, also a typical finding in spine pain patients," and, finally, Chambers "did not sit for lon[g]er than about 10 minutes at a time, and frequently arose and walked around in the exam room for a few steps – also typical of patients with true back pain." *Id.* Accordingly, Dr. Lary's summary "Discussion" maintained, in relevant part:

> I agree with Dr. Aggarwal's 2007 assessment and opinion that this claimant should not lift more than 10 pounds or stand or walk for longer than 10 minutes at a time (with a maximum of 1 to 2 hours per day). While Dr. Aggarwal's 2007 opinion that this claimant can sit for up to 30 minutes at a time with a maximum of 4 hours per day may have been accurate when he wrote it 2 1/2 years ago, I do not believe that opinion is accurate today. In my opinion, Nicholas Chambers cannot sit longer than 10 to 15 minutes at a time or sit for longer than 1 to 2 hours per day. I agree with Dr. Aggarwal's opinion that the claimant is unable to work and that his condition will last for 12 months or longer (I believe it is likely permanent and will likely get progressively worse as time goes on.) I do not believe that physical therapy or treatment at a pain management clinic would improve his functional limitations or make him employable.

(R. 548).

### 3. Dr. Aust

On January 27, 2009, Dr. Gilbert M. Aust of The Orthopaedic Center also

examined Chambers and reviewed his January 7, 2009 MRI from Valley Imaging. (R. 555-556).  Dr. Aust observed that Chambers "ambulated with a slight antalgic gait.  He was stooped over at the waist.  He was tender to palpation to fine touch all throughout the lumbar region . . . . He was tender into the bilateral sciatic notches, the SI joints as well as the lumbosacral junction."  (R. 556).  Dr. Aust diagnosed Chambers with "symptomatic radial tear syndrome L4-5 status post L4-5 discectomy superimposed on degenerative disc disease" and "chronic pain."  *Id.* Dr. Aust also stated that, to address Chambers' back pain, "some form of fusion at L4-5" is necessary, and "this was a very expensive undertaking especially for someone not having health insurance.  We recommended that he continue to try to get on disability and once he is able to do this then we can see him back and talk with him in more detail about a surgical procedure that would address the underlying back pain."  *Id.*

###### 4.   Dr. Jampala

Dr. Vijay Jampala of the Rheumatology and Arthritis Clinic P.C. examined Chambers on January 22, 2009 and noted that "[g]ait is normal.  He can walk on heels, tip toes, can stand on one leg at a time.  Romberg's sign is normal.  His hand to nose coordination is normal.  L.S. spine exam is diffusely tender, he can flex, extend but with pain, there is [a] well healed surgical scar over the back in

the midline.  Motor function is normal in all muscle groups – 5/5."  (R. 482).  Dr.

Jampala concluded that Chambers, who maintains a history of chronic low back

pain, "has a normal exam today[;] he has subjective pain but no objective findings

except he does have previous surgical scar from his back surgery.  His peripheral

joint exam and musculoskeletal exam is completely normal."  *Id.*

In addition, Dr. Jampala found that Chambers could frequently lift and/or

carry 10 pounds and occasionally lift and/or carry up to 50 pounds, (R. 483), and

that Chambers could sit, stand, and walk 15 minutes at a time for a total of four

hours each in an eight hour workday, (R. 484).  Also, Dr. Jampala determined that

Chambers could frequently climb stairs and ramps, climb ladders or scaffolds,

balance, stoop, kneel, crouch, and crawl.  (R. 486).

     5.   <u>Dr. Levine</u>

The ALJ requested Dr. Alan Levine to testify at the supplemental hearing to

resolve "conflicting evidence," (R. 77)—presumably the inconsistency between

Dr. Jampala's treatment notes and those of Dr. Aggarwal, Dr. Lary, and Dr. Aust.

Dr. Levine testified based solely on a review of Chambers' medical records and

initially provided:

> Dr. Hendricks, in March of '06 stated the low back pain was
> exacerbated after riding a four-wheeler . . . .  The onset was in March
> of '05, some one year prior to that.  And with the allegation of the
> severity of pain and inability to function at pretty much any level,

certainly riding a four-wheeler doesn't fit with the allegation of severity of limitations that we've heard and which is in the medical record. Also Dr. Lary in 8/7/06 related that the claimant alleged to be unable to dress himself, shower himself, and really function in any way independently. Yet his examination showed a normal sensory motor and reflex examination. Again, that doesn't compute with his total inability to do things and yet having in essence normal motor sensory and reflexes.

(R. 80-81). Moreover, as it relates to Chambers' RFC, Dr. Levine stated:

Dr. Lary in 6/5/09 stated that the claimant has severe impairments and related that he felt that the claimant could only lift less than 10 pounds occasionally, could only stand or walk one or two out of eight hours, and less than 10 minutes at a time. That he could only sit for one to two hours, and less than 10 to 15 minutes at a time. This is certainly in contrast to Dr. Jampala, date 1/22/09, in which he related on examinations. And this certainly would [not] correlate with Dr. Lary's examination that the gait was normal, and motor sensory reflexes were normal. Dr. Jampala, based on his examination, related that he felt the claimant could lift frequently 10 pounds, and [lift] occasionally 50 pounds. Felt that he could sit four out of eight [hours], but less than 15 minutes. And related no restrictions regarding activities of stairs, crawling, et cetera. This certainly is in contradistinction to the severe limitations that Dr. Lary had given.

(R. 81). Finally, in attacking the opinions of Dr. Lary and Dr. Aggarwal, Dr.

Levine concluded:

In my opinion, the degree of the degeneration in the disk can, and certainly does, produce some back pain. But the objective evidence does not support the degree of alleged limitations that were noted by claimant's testimony, by Dr. Lary and by Dr. Aggarwal. And it seems that they based their opinion primarily on the subjective statements of the claimant without really weighing objective evidence of the motor sensory and motor reflexes, and even normal gait. Also the idea of a normal gait is certainly contradistinction to statements that the

claimant is "unable to walk even short distances."

(R. 81-82).  Dr. Levine then announced the RFC ultimately adopted by the ALJ.

(R. 82).  *See infra*.

      6.   <u>Other Medical Evidence</u>

In addition to these physician reports, on March 13, 2005, Chambers

received a left sacroiliac injection at the Crestwood Medical Center, (R. 342), and

went to the Athens-Limestone Hospital's emergency room on March 21, 2005 for

continued back pain, (R. 369-381).  The next day, on March 22, 2005, Dr. Joe M.

Cannon with Valley Imaging Open MRI, Limestone Radiology Associates, P.C.

found that "[t]here is a central left paracentral disc herniation at L4-5.  The exiting

neural foramina are not effaced but there is encroachment upon the lateral recess.

Correlate with level of radiculopathy."  (R. 443).  Approximately one week later,

Dr. Calame Sammons performed a microdiskectomy to help relieve Chambers'

back pain.  (R. 344-345).  Chambers returned to Dr. Sammons on April 5, 2005,

"concerned about his incision and possibly some pus on the dressing.  He is

complaining of weakness in his legs.  He is still using a walker and hospital bed.

He is not sleeping at night."  (R. 346).  Chambers subsequently presented to the

Tennessee Valley Pain Consultants on April 25, 2005, and Dr. Morris Scherlis

provided that Chambers "moves all extremities well, however, shows obvious

facial grimaces with body position change.  He does change body position quite slowly and indicates that he is experiencing significant discomfort with change of body position.  He walks with a very guarded gait."  (R. 347-348).  However, Chambers refused the recommended clinical procedures and indicated no intention to return to the pain clinic—"he says that he was getting stronger pain medications from another source and does not wish to go back to Lortab 7.5mg.  I have tried to educate him that it is better to try and treat the pain at the source rather than treat it with higher dosing of narcotics, however, he is unwilling to accept this."  (R. 349).

On May 4, 2005, Chambers returned to Dr. Sammons "complaining of numbness in his leg . . . . He states that his pain is no different than it was before surgery.  He went to the pain center.  He did not want to do an epidural steroid because they would not give him sedation and he had a previous epidural without sedation and this was too painful.  He did not want to do pain management because they had stated they were going to give him similar medicines."  (R. 350). Dr. Sammons offered no other treatment alternatives for Chambers but rather recommended that Chambers obtain a second opinion regarding his back pain.  *Id.* Perhaps in an attempt to receive this second opinion, Chambers visited Dr. Robert B. Poczatek at Neurosurgical Associates, P.C. on June 17, 2005.  Dr. Poczatek's "physical examination" states "patient's trunk as well as bilateral lower

extremities reveals some tenderness along the lumbar paraspinals as well as some significant tenderness noted in the right SI joint.  His SI joint pain is exacerbated with Fabere's maneuver . . . . There is full strength in the lower extremities.  Reflexes are present and equal throughout."  (R. 351-352).  Dr. Poczatek recommended electrodiagnostic studies of Chambers' left lower extremity to evaluate for a radicular component to his pain complaint, (R. 352); however, there is no evidence that Chambers returned for the electrodiagnostic study or received any other treatment with Dr. Poczatek.

Additionally on June 18, 2005, Dr. Cannon at Valley Imaging stated in his treatment notes that:

> Signal intensity within the lower thoracic and mid lumbar area is normal down through L3-4.  There is moderate disc desiccation at L4-5.  The site of the previous surgery appears to be on the left at L5-S1 where there is thinning of the overlying soft tissues.  Signal intensity within L4-5 is decreased and there is some extra dural defect with a generalized disc bulging.  At L5-S1 there is a very minimal disc bulge only.  The neural foramina at L5-S1 are well preserved.  There is some enhancement at the site of the previous surgery on the left at L5-S1.  There is no evidence for a recurrent disc herniation.  The mild extra dural defect to the left appears to enhance consistent with postoperative scarring on the left.

(R. 442).  Similarly, Dr. Cannon's "impression" of Chambers' January 7, 2009 MRI—referenced by Dr. Aust—states "[l]ocal L4-5 disk disease with a left-sided radial tear with focal mild posterior disk protrusion just to the left of midline.  This

protrusion is about 3 mm across."  (R. 549).  Moreover, consistent with Dr.

Levine's testimony, the treatment records from Dr. Earnest Hendrix establish that

on March 30, 2006, Chambers complained of back pain after riding a four-

wheeler.  (R. 432). Dr. Hendrix's records further provide that on October 10, 2005,

Chambers "painted a room and now he has back pain."  (R. 434).

Finally, the medical evidence also demonstrates that Chambers presented to

the Athens-Limestone Hospital's emergency room on May 4, 2008 with low back

pain that occurred after lifting his 27 pound daughter, and the hospital released

Chambers with no lifting greater than 5 pounds, and no twisting, turning, or

bending discharge instructions.  (R. 455-458).  Chambers again visited the

emergency room on January 5, 2009 for back and leg pain (R. 507-516), on

January 30, 2009 for a purported seizure where Chambers tested positive for

cannabinoids, (R. 502-506, 539), and on February 20, 2009 for back pain (R. 493-

501).

B.     The ALJ Improperly Considered the Medical Evidence of Record

While the ALJ may have properly refused to adopt Dr. Aggarwal and Dr.

Lary's "disability" conclusions,[1] the medical evidence fails to support the ALJ's

_____

[1] The determination of "disability" under the Act is reserved for the Commissioner.  Thus, the Commissioner is "responsible for making the determination or decision about whether you meet the statutory definition of disability.  In so doing, [the Commissioner] review[s] all of the medical findings and other evidence that support a medical source's statement that you are

RFC assessment.  Generally, "[i]t is well-established that 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'"  *Crawford v. Comm'r of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  *See also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The Eleventh Circuit instructs that "good cause" exists when the "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  Additionally, the "ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis*, 125 F.3d at 1440.  Reversal is warranted here because of the ALJ's failure to articulate why he gave less weight to the treating physician's opinions.

      After consistently treating Chambers for chronic back pain from October

---

disabled.  A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  *See Bell v Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986) ("The regulation in 20 C.F.R. § 404.1527 provides that although a claimant's physician may state he is 'disabled' or 'unable to work' the agency will nevertheless determine disability based upon the medical findings and other evidence.").  And indeed, no "special significance" is given "to the source of an opinion on issues reserved to the Commissioner described in" §§ 404.1527(d)(1) and 416.927(d)(1).  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

2006 until February 2007, Dr. Aggarwal opined that Chambers "should not lift greater than 10lbs; standing and walking 10 minutes at a time with a maximum of 1-2 hours per day and sitting 30 minutes at a time with a maximum of 4 hours per day." (R. 452). Similarly, after examining Chambers on June 5, 2009—the most recent examination—Dr. Lary stated that "I agree with Dr. Aggarwal's 2007 assessment and opinion that [Chambers] should not lift more than 10 pounds or stand or walk for longer than 10 minutes at a time (with a maximum of 1 to 2 hours per day)." Dr. Lary also provided that, "[w]hile Dr. Aggarwal's 2007 opinion that this claimant can sit for up to 30 minutes at a time with a maximum of 4 hours per day may have been accurate when he wrote it 2 1/2 years ago, I do not believe that opinion is accurate today. In my opinion, Nicholas Chambers cannot sit longer than 10 to 15 minutes at a time or sit for longer than 1 to 2 hours per day." (R. 548). As it relates to Chambers' functional abilities, examining physician Dr. Jampala provided that Chambers could frequently lift and/or carry 10 pounds but could sit, stand, and walk 15 minutes at a time for a total of four hours each in an eight hour workday. (R. 484). Finally, after visiting the emergency room on May 4, 2008, the treating physician discharged Chambers with no lifting greater than five pounds, and no twisting, turning, or bending

discharge instructions.  (R. 455-458).[2]

Despite this overwhelming evidence, nonetheless, the ALJ decided to adopt Dr. Levine's—the only non-examining and non-treating physician—recommended RFC.  This RFC included the capacity to "sit for six hours total out of an eight-hour workday and for less than 45 minutes without the ability to stand and stretch and sit back down; with usual customary breaks he can stand four hours total out of an eight-hour workday and for less than 30 minutes without the ability to sit down for 1-2 minutes or to change that position; walk four hours total out of an eight-hour workday and for no longer [than] 30 minutes at a time without the ability to sit down for 1-2 minutes or to change that position."  (R. 18).  Put succinctly, the ALJ found that Chambers could sit for 45 minutes at a time, stand for 30 minutes at a time, and walk for 30 minutes at a time even though every physician that actually examined Chambers offered more severe functional limitations.  Accordingly, the ALJ's decision is not supported by the substantial

---

[2] "Residual functional capacity assessment[:] Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record . . . . When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work." 20 C.F.R. §§ 404.1545(a)(1), (b); 20 C.F.R. §§ 416.945(a)(1), (b).

evidence.

The ALJ and Dr. Levine meticulously attempt to discredit Dr. Aggarwal and Dr. Lary because they claim that these physicians relied too heavily on Chambers' subjective pain allegations and the fact that Chambers actually exhibited normal gait and normal motor, reflex, and sensory functions.  (R. 20-25, 80-82).  Yet, the ALJ fails to offer any evidence, medical or otherwise, as to why he adopted Dr. Levine's functional capacity assessment rather than the assessment of the physicians examining Chambers.  At the very least, the court cannot glean why the ALJ failed to adopt the functional capacity assessment of Dr. Jampala—the physician performing the consultive examination ordered by the ALJ.  In other words, after examining Chambers, Dr. Jampala still found that Chambers could only sit, stand, or walk in 15 minute intervals; however, the ALJ disagreed and determined, based on the report of Dr. Levine, that Chambers could sit for 45 minutes at a time, stand for 30 minutes at a time, and walk for 30 minutes at a time.  Perhaps most importantly, neither the ALJ nor Dr. Levine provided any explanation for this increased functional capacity and specifically the increased time intervals Chambers can withstand given his impairments—a needed analysis when the ALJ favors the opinion of a non-examining / non-treating physician over that of examining and treating physicians.

Furthermore, the ALJ and Dr. Levine offer no explanation as to why a "normal gait" or "normal motor, sensory, and reflex functions" necessarily discredit the functional limitations exposed by Drs. Aggarwal, Lary, and Jampala. This failure is significant because Dr. Aggarwal examined Chambers on at least seven occasions including when he had fallen due to pain in his back and legs, and Dr. Lary reviewed Chambers' January 2009 spinal MRI which revealed increased disc bulging and also witnessed Chambers shifting his weight while sitting and the inability to sit for more than 10 minutes—both objective signs of back pain. Indeed, Dr. Lary's medical opinion appears consistent with Dr. Cannon's impression of the January 2009 MRI and with Dr. Aust's recommended treatment. These medical records by examining or treating physicians and the corresponding functional assessments are not so inconsistent or unsupported by the record as a whole to warrant giving more weight to the testimony of a non-treating and non-examining physician—Dr. Levine.

## VI.  Conclusion

Based on the foregoing, the court concludes that the ALJ's determination is not based on substantial evidence.  Therefore, the Commissioner's final decision is **REVERSED** and **REMANDED** for the ALJ to make a disability determination based on the complete medical record.  Upon remand, the ALJ is charged with finding an RFC consistent with the medical record and record as a whole such that

Chambers' impairments are properly assessed.  A separate order in accordance with the memorandum of decision will be entered.

Done the 8th day of August, 2012.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE